[No. 3355.]

## COLORADO AND SOUTHERN RAILWAY CO. v. LAUTER.

1. NEGLIGENCE—*When for the Jury.* When the testimony is in conflict, or fair men may honestly differ in their conclusions therefrom, the question of negligence is one of fact for the jury.

The evidence examined and the question held properly left to the jury.

2. —— *Trial—Motion for Non-Suit and Directed Verdict.* Defendant moved for a non-suit at the conclusion of plaintiff's case in chief, and after that motion was overruled, introduced evidence in defense, and at the conclusion of the entire evidence, moved the court for a peremptory instruction in its favor, the ground of the former motion being also included in the latter. *Held,* that the motion for non-suit was waived, and all the evidence in the case must be examined in considering the ruling upon the motion for a directed verdict.

3. NEGLIGENCE—*Duty of Traveller on Highway at Railroad Crossing.* A woman, who was approaching a railroad crossing on a

public highway, was bound to exercise that degree of care to avoid being injured by a passing train, which an ordinarily prudent woman would exercise under the same circumstances. It was her duty to look, and to continue to look, in both directions, as well as listen, until she reached a point in such proximity to the track that further looking and listening was not reasonably necessary; and it is conclusively presumed that she saw what was reasonably visible, and heard what was reasonably audible, regardless of whether she actually saw or heard.

4. CONTRIBUTORY NEGLIGENCE—*Burden of Proof.* Where the evidence of plaintiff did not establish a conclusive presumption of contributory negligence, the burden of proving such contributory negligence rested with the defendant. *Held,* that in the circumstances of the case, the issue was properly submitted to the jury.

5. ——. *Speed of Train—When Proper to Be Considered.* Where a traveller upon a highway was injured at a railroad crossing, in consequence of alleged negligent operation of a train upon the railroad, the speed of the train may be considered in connection with other circumstances—for example, that proper signals were not given, that the crossing was known to be a dangerous one, by reason of obstructions to the view between the highway and the railroad, and that the train was approaching the crossing, upon a down grade, at a greater speed than was customary upon that part of the railroad.

6. —— *Condition of Peril Produced by Negligence of Defendant.* One who by the negligence of another is suddenly placed in a situation of peril is not chargeable with contributory negligence, merely by reason of a failure, through fright or bewilderment, to exercise the same discretion and sound judgment as one, not in such extremity, might have exercised.

*Appeal from Denver District Court.* Hon. CARLTON M. BLISS, JUDGE.

Messrs. DINES, WHITTED & DINES, and R. H. WIDDICOMBE, for appellant.

Mr. EDWARD C. STIMSON, Messrs. TEBBETTS & MUNROE and Mr. LAWRENCE LEWIS, for appellee.

WALLING, Judge.

This is an appeal from a judgment rendered against the appellant in an action brought by the

appellee, to recover for injuries alleged to have been sustained by her in consequence of the negligent operation of a train on appellant's railroad, at a place called Church's Crossing, where the railroad intersects a public highway. At the time of the occurrence of the accident, appellee, a woman of mature age, was riding along the highway mentioned, in a vehicle drawn by one horse, which was being driven by appellee's companion, a little girl eleven years of age. The vehicle and horse belonged to the little girl's father, and he had permitted the child to drive appellee, at the latter's request, to the town of Broomfield, which was reached by the public road at some distance northerly from Church's Crossing. It appeared that the little girl was accustomed to ride and drive the horse, which ordinarily was gentle to the degree that it required whipping to urge the animal out of a walk. Appellee and her companion were approaching the railroad crossing, at about three o'clock in the afternoon, from the southwest, on the way to their destination. South of the crossing, the highway and the railroad follow the same general direction—substantially north and south; but a short distance southwest of the crossing the highway bends, so that it crosses the railroad almost at right angles. At the time to which this discussion relates, there was a large two story dwelling house about four hundred and fifty feet southwesterly from the crossing; and this house and two outbuildings were situated near the railroad and between it and the highway. About the house were many large poplar and cottonwood trees, some of them growing very close to the embankment on which the railroad track was laid; and there was an

orchard, of good sized trees, three or four acres in extent, southwest of the house. The buildings and trees mentioned were between the railroad and the highway, on the left-hand side of a traveller approaching the crossing along the highway from the south—so as to interfere with the view of the railroad track from the highway, on that side, both before and after passing the bend in the road leading up to the crossing. The view in the direction of the railroad from the highway was more obstructed when the leaves were on the trees, which was true at the time of the accident here in question. Certain other facts should be noticed, as illustrating the physical conditions near the crossing, as they existed at that time. A wagon bridge in the highway, immediately south of the bend above mentioned, is three hundred and eighty-two feet distant from the center of the crossing. From about the point where the highway bends to the east, the road is uphill to the crossing, the ascent being steeper near the crossing. Three hundred and twenty-five feet south of the center of the crossing, the railroad track crosses an iron bridge, and on either side of this bridge the track is laid upon an embankment approximately eighteen feet in height. From a point some distance south of the railroad bridge, the railroad runs down grade to the crossing. Appellee had no previous knowledge of the road; but, after they had driven across the wagon bridge, and were about to ascend the hill, she observed the railroad crossing at the top of the hill, and at her request the horse was stopped, while both looked and listened to ascertain if a train was coming. From the point where they so stopped, according to the appellee's

testimony, she was able to look along the railroad track for a short distance beyond, that is, south of the railroad bridge, and there was nothing to obstruct her view between the railroad bridge and the crossing.   Seeing nothing and hearing nothing to warn them of the approach of a train, the horse was started up the hill, on a walk, towards the crossing.   Before the crossing was reached, but just how far from it is not very clear from the testimony, appellee was looking along the railroad toward the north to observe whether a train was coming from that direction, and turning to look in the opposite direction, she saw a passenger train at the railroad bridge, coming at a high rate of speed from the south.   At about the same instant of time, the danger whistle was sounded by the engineer, and the little girl, with a scream, dropped the lines and jumped out of the wagon.   Appellee seized the lines and, according to her testimony, pulled on them with all her might in order to stop the horse.   There was testimony to the effect that the horse became frightened and stopped momentarily, but afterwards started towards the crossing, appellee all the while tugging at the lines to stop him; and that, as the train passed the crossing, the horse swerved to the right, overturning the vehicle, and appellee was thrown upon a kind of platform made of slag, enclosed by boards set up edgewise, on the right-hand side of the road and near the railroad track, sustaining the injuries described in the testimony.   It appeared that the platform mentioned had been constructed by the appellant company for the accommodation of passengers, getting off or on some of its trains which

stopped at the crossing upon signal. Other material facts will be noticed later.

The complaint alleged that the defendant company caused its locomotive and attached train to be driven, run and conducted, along its railroad track at and near the intersection of the railroad with the public highway, in a negligent, careless and reckless manner, at a speed of about forty-five miles per hour; and further charged defendant with negligence in failing and neglecting to cause the whistle or bell on the locomotive to be sounded or rung, or to give any signal or warning of the approach of the train, until the locomotive and train were at a point about one hundred yards from the intersection of the highway, by reason whereof neither the plaintiff nor her companion saw or heard the locomotive and train until the same were about seventy-five yards from the crossing. It was alleged that, by reason of the negligence of the defendant stated, the horse, which was drawing the vehicle in which the plaintiff was riding, was compelled to suddenly leave the highway near the intersection of the railway with the highway to avoid being struck by the locomotive and train, and in that way the vehicle was overturned and the plaintiff was violently thrown upon some slag or stones, sustaining injuries, etc. The answer of the defendant denied all of the allegations of the complaint imputing negligence, and affirmatively alleged that the plaintiff failed to exercise reasonable care at and immediately prior to the time of receiving the alleged injury, which failure on her part directly contributed to such injury. The affirmative defense was put in issue by replication. At the trial, the defendant moved for

a non-suit at the conclusion of the evidence introduced on behalf of the plaintiff, and the motion was overruled. The defendant excepted to this ruling of the court, but afterwards introduced evidence in defense, and after all the evidence was in, moved the court to instruct the jury to return a verdict for the defendant. The motion for non-suit was put upon the ground that the uncontradicted evidence showed that the plaintiff was guilty of contributory negligence, which, in law, precluded a verdict in her favor; and the motion for a directed verdict was made upon the same ground, and the further ground that it was shown by the uncontradicted evidence that defendant was not negligent as alleged in the complaint. The latter motion was likewise denied, and error is assigned upon the decision of the court with respect to both motions. In this state of the record, it is not important to consider the rulings upon the two motions separately, since it has become necessary to examine all of the evidence introduced at the trial, for the purpose of determining whether or not the case should have been withheld from the jury. *Railway Co. v. Henderson,* 10 Colo. 1; *Horn v. Reitler,* 15 Id. 316; *Jackson v. Crilly,* 16 Id. 193; *Weil v. Nevitt,* 18 Id. 10; *Denver, etc., Ry. Co. v. Robinson,* 6 Colo. App. 432, 435.

The appellate courts of this state have been frequently called upon to define the basic principles by which trial courts are to be guided in the determination of motions of this character under varying conditions of fact. Thus, in *Nichols v. R. R. Co.,* 44 Colo. 501, 508, the supreme court, by Mr. Justice Gabbert, said:

"Cases frequently arise wherein it becomes the duty of the trial court to determine the question of the negligence of the plaintiff as a matter of law, but those are cases where the testimony will allow no other inference; and hence, it follows that where the question of negligence depends on a state of facts from which different minds may honestly draw different conclusions on that issue, the question must be submitted to the jury for determination.—*Colo. Central R. R. Co. v. Martin*, 7 Colo. 592; *Lord v. Pueblo S. & R. Co.*, 12 Colo. 390; *Solly v. Clayton*, ibid. 30; *D. & R. G. Ry. Co. v. Spencer*, 27 Colo. 313. There is no doubt about this proposition, but the difficulty arises in applying it. The obligations, rights and duties of railroads and travelers upon intersecting highways are mutual and reciprocal, and no greater degree of care is required of one than the other. True, the railroad company has the right of precedence at such crossings; but both parties, in the exercise of their respective rights, are nevertheless required to exercise reasonable care in enjoying them—the one to avoid inflicting injuries, and the other to avoid being injured."

And in the case of *Tramway Co. v. Wright*, 47 Colo. 366, Mr. Justice White, speaking for the court, said:

"What constitutes negligence and reasonable care is a question for the court, and whether the facts relied upon to show whether either has been proved is for the jury. In the determination of such matters all disputed facts are to be decided in favor of the plaintiff, and all presumptions and inferences favorable to him, which the evidence warrants, must be accepted as true. *Nichols v. Chicago, etc.*,

*Co.*, 44 Colo. 501.   Therefore, when the facts, or the inferences to be drawn therefrom are in any substantial degree doubtful, or fair minded men might reach different conclusions from the facts, the only proper rule is to submit the question to the jury for determination.   It is only where the facts are undisputed, and but one inference can be drawn from them, that it becomes the duty of the court to determine, as a matter of law, whether there was such lack of negligence or the presence of such contributory negligence as to preclude any recovery. *Behrens v. K. P. Ry. Co.*, 5 Colo. 400; *Denver S. P. & P. R. Co. v. Wilson*, 12 Colo. 20, 27; *Lord v. Pueblo S. & R. Co.*, 12 Colo. 390; *Guldager v. Rockwell*, 14 Colo. 459; *Horn v. Reitler*, 15 Colo. 316; *Union C. & O. Co. v. Sunberg*, 36 Colo. 8.''

In the present case, the measure of plaintiff's duty in observing due care and caution to avoid injury, in the circumstances disclosed by the evidence, were stated in instructions numbered four and seven given by the court to the jury.   Those instructions were not objected to on either side, and they may be taken to be a fair statement of the law applicable to the defence of contributory negligence.   In instruction four, the jury were told, in substance, that when the plaintiff approached the railroad crossing, it was her duty to exercise that degree of care and caution which an ordinarily prudent woman would have exercised under the circumstances disclosed by the evidence; that it was her duty to look, and continue to look in both directions, and listen for an approaching train, until she had reached a point in such proximity to the track that further looking and listening were not reasonably neces-

sary, and if under all the circumstances a prudent woman would have stopped her vehicle for that purpose, it was the duty of the plaintiff to have so stopped. And by instructions even the jury were told that "it was the duty of the plaintiff not only to look and to listen, but to see what was reasonably visible and to hear what was reasonably audible, and if the train was in sight, or its approach was reasonably audible, to one in her position, at any time when she was at a safe distance from the railroad track, she is conclusively presumed to have seen and heard it, regardless of whether or not she actually did see or hear it." It is contended on the part of the appellant, however, that the question ought not to have been submitted to the jury at all, for the reasons, first, that the testimony of appellee herself showed that she did not exercise the degree of caution which the law requires of one approaching a railroad crossing, that is, that she did not look and listen to ascertain whether a train was approaching, when and where such attention would have availed to prevent the accident complained of; and, second, that the only legally permissible inference from the undisputed facts of the case was that she failed to use proper care and caution to avoid apparent danger.

As to the testimony of the appellee, it must be said that, considered fairly, it tended to show that she caused the horse to be stopped on the slope of the hill between the bend of the highway and the crossing, for a time sufficient to satisfy both her and her companion, by using their eyes and ears, that there was no train approaching; that she looked back of her and to the right and left, and there was

no train in sight; that they then proceeded up the hill, the horse walking slowly, and appellee continued to watch in both directions for a train; that her view of the track on the left was obstructed by the trees and one of the houses, the trees being all around the dwelling house and near the railroad bridge, and that the view was not much improved as they got farther up the hill; that she heard nothing and saw nothing to warn her that the train was coming, until she observed it at or near the iron bridge, coming towards the crossing, as she expressed it, "like the wind;" that she was listening to hear the whistle of the locomotive, and that no whistle was blown until the locomotive was almost at the bridge, when the sharp warning or danger signals were blown; that, in the interval of a few seconds which elapsed from the time when she first saw the locomotive until it reached the crossing, she was occupied in picking up the lines, which the little girl had dropped in her fright, and endeavoring to control the horse; that the horse exhibited great fright, and bolted in the direction of the crossing, and she held him back with all her might; and that the horse was close to the engine, when he turned to the right toward the cattle guard on that side of the crossing, where she was thrown from the wagon. It appeared that she might have seen the train a few seconds before she actually did see it—but just how many seconds before is not very certain. But it could reasonably be inferred from her testimony that, when the locomotive first came in sight, she was for the moment looking along the track north of the crossing to see if there was any train in that direction. She testified in that regard, on cross-examination:

"Q. You stated that you had been looking to your right toward Broomfield just before the train whistled? A. Yes, sir. * * * I looked if the train was coming that way, because I did not hear the train; it came so swift that I didn't hear it, only the danger whistle right on the bridge. * * * Q. As you came around over the hill you were coming in the same direction as the train, and you could see toward Broomfield a long way? A. Yes, sir. Q. But you could not see so well towards the Church house? A. No, sir, on account of the trees. Q. And you were looking up in the direction from where you could see a long way? A. Yes. Q. And not paying any attention to what was happening on the left? A. I paid attention, but I could not turn my head this way and that way so quick."

If it could be inferred from the appellee's statements on the witness stand that she might have exercised a greater degree of prudence and caution to avoid possible danger, the inference was not so conclusive or indisputable as to warrant the court in holding, as a matter of law, that her testimony disclosed such contributory negligence as prevented a verdict in her favor. The burden of proving the contributory negligence of the plaintiff rested with the defendant, and in determining whether the defendant was entitled to a directed verdict on that issue, the trial court was justified in giving the plaintiff the benefit of the most favorable construction which could reasonably be given to her testimony.

It is further contended that certain physical facts, established by undisputed evidence, were legally conclusive that appellee did not exercise the de-

gree of care and caution, which the law required of her, notwithstanding her testimony that she looked and listened for an approaching train; and this claim requires a further investigation of the evidence. In this connection, it should be observed that the testimony of Mary McMorrow, the little girl, who accompanied appellee at the time the latter was injured, and who was called as a witness by the defendant, tended to corroborate the statements of the appellee in some important particulars. She, Mary, testified that she saw the train, when it was at the railroad bridge, and that she then threw the lines down and jumped out of the buggy. She said that she did not stop the horse, but jumped out while the horse was going. She further testified that the horse was twenty or twenty-five feet from the track when she first saw the train; that she had been looking first in one direction and then in the other to see if a train was coming; that she saw the train at the same time she heard the whistle, and that the whistle was not blown before the train got to the railroad bridge. She also said that she believed appellee was looking out for a train as they were driving towards the track.

It is undoubtedly true that, at the time of the occurrence upon which the action was based, the view of one traveling on the public road northerly towards the crossing was substantially interrupted, on the left, by the buildings, and particularly by the trees, which were then in full foliage. The statements of the many witnesses who testified with reference to how far a train might be seen from the highway, at different points west and south of the crossing, were conflicting and somewhat confusing.

Witnesses for the defense talked about looking between, through and under the trees, in a fashion probably more satisfactory to themselves than enlightening to others. Some of this testimony does not seem to be consistent, in its details, with the evidence afforded by photographs introduced as exhibits on the side of the plaintiff below. Probably, from all the evidence, the appellee might have selected a more favorable point of view, from which to watch for a train, coming from behind them, beyond the trees and buildings, than the place where they stopped to look, had she been as well acquainted with the locality as were some of the witnesses. Two witnesses testified for the defense that the best view from the highway towards the railroad, on the left of one approaching the crossing from the southwest, could be had at a point one hundred and seventy-five feet distant from the crossing, by looking through the trees. One said that, at a point on the highway one hundred feet from the crossing, the track could not be seen at all. Mr. Church, who owned the house near the crossing, which has been mentioned, and had lived there for forty-three years, testified for the defendant:·

"Standing seventy-five feet from the track, looking south, you can see about eight hundred feet —see the train and have a clear passage for eight hundred feet. At one hundred and twenty-five feet you can't see quite as far. * * * I have looked at it when the trees had leaves on and when they didn't have leaves on. Since October, 1906, a few limbs have been cut off from some of the trees near the railway. Before they were cut off they were high enough so you could see the train under them."

Another witness for the defense said:

"From a point about twenty-five feet from the railroad crossing, I could see up the track about one thousand feet. I stood at that point because that was where the horse was standing when the engineer gave the signals. I know it was one thousand feet, because we measured it, I think I stepped it. * * * The only difference between conditions then and those shown in exhibit three (a photograph introduced by the defendant) is, that the trees then had leaves on them and that limb is now cut off. At the time I made my observation I could see through the limb which has since been cut off. I could see through the tree below where that limb stood. I should say it was five hundred or six hundred feet from the railroad crossing to that tree. * * * The body of the tree was about six feet from the grade. These limbs did not extend over the rails; I should judge they extended to within six feet of the rail on the east."

Another witness stated:

"I should judge that when within one hundred and seventy-five feet of the crossing you can see a distance five times as great as from the crossing south to the railroad bridge. It is my opinion that one hundred feet from the track one could see five hundred or six hundred feet along the track. You can see further at fifty feet than at one hundred feet from the track. When one hundred and twenty-five feet from the track in the wagon road you would have to look through the trees. At one hundred and seventy-five feet you can see around the trees."

Some of the witnesses, who appeared to have made their observations when the trees were denuded of leaves, stated that from a point on the public road twenty-five feet from the crossing, they were able to look along the track southerly for more than two thousand feet. On the other hand, witnesses for the plaintiff, who lived near the crossing, gave testimony to the effect that one must be very near the track at the crossing to see any considerable distance south of the railroad bridge, when the leaves were on the trees. It should be said, with respect to the testimony of plaintiff's witnesses, that their conceptions of distances were exceedingly vague. But consideration of the entire mass of testimony bearing upon the extent of the obstruction to the view from the highway towards the railroad, in connection with the photographic views, convinces us that the evidence in that regard was far from being so one-sided, that it established a conclusive presumption of contributory negligence on the part of the plaintiff, in law, so as to bar her from recovery, without reference to any question as to whether or not her injuries resulted from the alleged negligence of the defendant's servants.

Before leaving this branch of the discussion, it is proper to refer to the testimony of the engineer in charge of the locomotive attached to appellant's train. He said:

"I remember the lady and little girl there in the road at Church's Crossing. When I first saw them the train was perhaps fifteen or twenty feet south of the bridge coming at about thirty-five miles an hour. At that time they were fifty or sixty feet north of the wagon bridge toward the road cross-

ing. They were riding along slowly, and I thought they were not paying any attention. I gave the whistle, four sharp blasts, because I thought they were not paying any attention to the train, and I wanted to attract their attention so that they would see the train coming and would not get on the track; they couldn't anyhow. I should judge that the distance from the wagon bridge to the crossing is something over two hundred feet, and that those people were seventy-five or one hundred feet away from the track when I first saw them. The locomotive was fifteen or twenty feet from the railroad bridge when I first saw them, and I reached up and caught hold of the whistle rod. * * * Those trees at the time were covered with pretty heavy foliage, and did hinder me from seeing them. The first place where I could see these people along the wagon road was when they were at the point indicated, and I was then near the bridge. * * * When I first saw the horse it was walking along at a fair gait. I didn't notice the conduct of the horse after I gave this warning signal. I saw the lady reach over and catch hold of the lines, and when I passed them they were down below me and back of me. * * * I looked back, and I should judge they were at least sixty feet from the baggage car when I was just over the crossing, because I shut the throttle off and intended to stop. * * * After I whistled the horse started to run toward the train and the lady caught hold of the lines. The horse was sixty feet from the track when I shut off the throttle, and I should judge it was about one hundred feet from the crossing when I first saw it.''

The same witness testified that he was sure that he had blown the whistle at the whistling post, fifteen hundred or sixteen hundred feet distant from the crossing; and that he never failed to blow the whistle for that particular crossing, for the reason that, "on account of the trees there, it is a bad crossing." It seems, from the testimony of other witnesses, that the engineer may have been mistaken in his estimate of the distance of the horse and wagon from the crossing, when he gave the danger warning. His testimony on that point, as well as with respect to the distance of the horse from the crossing, when the engine crossed the highway, is clearly in conflict with that of the appellee, and her companion, Mary McMorrow, and also with that of the witness Forsthoffer, who saw the occurrence. The latter said:

"I heard the train before it gave the warning signals, and I heard the sharp short signal blasts. I should think at that time the buggy and occupants were about twenty-five feet from the crossing. The train was nearly on the bridge, right at the bridge. * * * When I heard the whistle they stopped a second, and then started up again. The horse kept going, and the horse just about got up to the express car, and then he turned off a little east on the platform. The horse walked on the edge of the platform, and the lady tipped out. * * * The train was going fast. I don't know whether the little girl jumped out of the buggy or not. Q. Now, can you say how close to this horse or the buggy the train was as it passed? A. I don't think it went any closer than twelve feet."

The same witness said:

"I saw these people just after they crossed the wagon bridge, and also when they were twenty-five feet from the track, at the time the whistle blew. I watched them because the train was coming, and they were about thirty feet from the track when I first became aware of the approach of the train."

Counsel for appellant, in their brief, quote at large from the opinion of Judge (now Mr. Justice) Vandeventer in *Chicago etc. Ry. Co. v. Andrews,* 130 Fed. Rep. 65'; but they omit reference to the portion of that opinion, which seems to bear most directly upon the facts of this controversy, and wherein it was said:

"He (plaintiff) had worked much in the neighborhood of the railroad, frequently crossed the tracks at the crossing; knew of the double track, the surroundings of the crossing, and the speed of the Chicago special. He also knew that a train might pass at any time, and that some of the trains, including this one, did not stop at Scranton.   *   *   * In approaching the crossing from the north, the view of the railroad from the west was somewhat obstructed by the structures and the stockyards above named, but, while there was a conflict in the evidence on the point, it will be assumed that plaintiff was not negligent in failing to see the passing train before he reached the immediate vicinity of the tracks."

The distinguished court there held that the plaintiff was guilty of contributory negligence, in law, because, after he reached the railroad tracks, "he actually stepped in front of a moving train,"

the proximity of which he could, by the exercise of reasonable care, and should have discovered, before attempting to cross the track. The circumstances and surroundings of the accident involved in the last mentioned case, as disclosed by the court's opinion, are so widely variant from the facts presented by this record, that the opinion mentioned seems to lend no possible support to any contention on the part of appellant here.

*Westerkamp v. C. B. & Q. Railway Co.,* 41 Colo. 290, furnishes an apt illustration of the proper application of the rule of law, which appellant's counsel insist should determine the present controversy. Westerkamp was attempting to drive across the track in front of a locomotive, which struck his wagon, demolishing it and seriously injuring him. He was familiar with the crossing and its surroundings, and knew that a train was due from the east about the time when he arrived at the crossing. The accident occurred about six o'clock in the morning, in the month of January. While the morning was dark, cloudy and foggy, the locomotive carried a brilliant headlight, which was easily discernable at a great distance, and there seems to have been nothing to prevent his seeing it for some little time before he reached the crossing. Discussing the evidence on that point, it was said in the opinion:

"He (plaintiff) knew a train was about due, and testified that distant about one hundred and ninety feet from the track he commenced looking towards the east, and, when within fifty or sixty feet of the crossing, stopped his team, and looked and listened for an approaching train from that direction; that he did not hear or see one; that he noticed switch and

other lights from a quarter to half a mile distant, in the direction in which he looked; that as he approached the track he continued to look and listen until within twenty-five or thirty feet of the crossing, but neither saw nor heard the train which collided with him, but did see the switch and other lights above referred to. He then drove upon the track and was injured.  *  *  *  At the point where plaintiff first stopped there was nothing to obscure his view along the track towards the east for a distance of two thousand feet or more, other than the trunks of a few leafless trees, and a couple of telephone poles which would have done nothing more than momentarily obscure the headlight of the locomotive when a tree or pole was in the direct line of his vision and the headlight.  *  *  *  He says he continued to look until within twenty-five or thirty feet of the track, but did not see the train approaching from the east. From this point, according to the undisputed testimony, there was nothing whatever to obstruct his view for an indefinite distance to the east.  *  *  *  In such circumstances it seems incredible that he looked toward the east, as he says he did, and failed to notice the rapidly moving headlight when he first began to look or its proximity when he was within twenty-five or thirty feet of the track, when the headlight must have been so distinctive by reason of its brilliancy and relative position to the other lights of which he speaks. Clearly, although it may have been cloudy and foggy at the time, these conditions were not sufficient to obscure the brilliant headlight of the locomotive when he first looked, or when it was two hundred and fifty or three hundred feet distant, when lights

of less power in its near vicinity were discernable at the time he first looked, and when he last looked, from a quarter to half a mile beyond. From all the facts and circumstances there is but one conclusion deducible, viz., he did not look; because, if he had, he could not have failed to discern the train approaching the crossing he was about to drive over.''

The evidence in the case at bar left no room to doubt the fact that, at the time of the accident, the view from the highway toward the railroad, in the direction from which the train was approaching, was obstructed for a very considerable distance between the Church house and the crossing. The outlook through the trees, between the house and the railroad, was better from some points of view than from others. From the testimony of the plaintiff it appeared that, when they stopped to look, on the slope of the hill, after passing the bend in the highway, the track was visible at a short distance south of the railroad bridge and from thence north to the crossing. But the train was coming from the south, and, judging from its speed, could not have reached the open space between the trees and the crossing. There is no innate improbability in the testimony of appellee and her companion that the train was not in view when they stopped the horse to look and listen. Nor can it be said that the undisputed evidence proved, beyond controversy, that she ought to have discovered the train, before the engineer whistled the danger signal. It was not an unreasonable inference from the evidence that she was not able to see the train before the engineer discovered the vehicle and its occupants, which, as he

says, was when the train was perhaps fifteen or twenty feet south of the bridge. The engineer's statement as to the location of the horse and wagon, when first seen by him and when the train passed the crossing, cannot be reconciled with the testimony of the plaintiff and other witnesses, who were in a situation to observe what actually occurred. This conflict was vital upon all phases of the controversy, and its resolution was plainly for the jury. It will be borne in mind that the appellee was not attempting to drive towards the crossing, at any time after the danger signal was sounded, but, as she stated, she was using all effort to stop the horse, when she was thrown out of the wagon.

In Westerkamp's case, *supra,* the court, speaking of the cases cited by his counsel, in support of their contention that the question of his negligence should have been submitted to the jury, said:

"These cases, when analyzed, in no sense conflict with the conclusion we have reached, because it appears therefrom that the testimony bearing on the subject of the want of care of the party injured was either conflicting or of a character from which different inferences might reasonably be drawn, on that question; or it appeared that the injured party had made a mistake with respect to the approach of the train in such circumstances as made it necessary to leave it to the jury to determine whether or not such mistake was the result of a failure to exercise proper care."

Whether appellee should have stopped a second time and waited, before she had any warning that a train was coming, or whether she exercised due care in proceeding slowly, while giving her at-

tention to looking and listening for a train, was, under all the facts and circumstances of the case, a question of mixed law and fact, to be determined by the jury under the instructions of the court.

The preceding discussion of the facts bearing upon the alleged negligence of the plaintiff is necessarily based upon the hypothesis that there was competent evidence in support of the allegations of the complaint to the effect that no proper signal or warning was given at a reasonable distance from the crossing, to notify persons on the highway near the crossing that the train was coming. If such warning were given, in a timely manner, the fact must have been fatal to a recovery by the plaintiff, not only as establishing a conclusive presumption of want of care on her part, but also because of a failure of proof of negligence on the part of the defendant. In this view, the correctness of the ruling on the motion for a directed verdict depends upon the inquiry whether the jury were at liberty to find from the evidence that the engineer failed to blow the whistle for the crossing, prior to blowing the danger signal at or near the railroad bridge. It has already been stated that the plaintiff testified that the whistle was not blown prior to giving the danger signal, and in that she was corroborated by the testimony of her companion, Mary McMorrow. They were certainly in a position to hear the whistle, if it had been blown, and their attention was directed to watching for the approach of a train. Another witness for the defense, besides two of the plaintiff's witnesses, testified that they heard no whistle until the danger signal was blown at or very near the railroad

bridge. The three witnesses last mentioned all heard the danger signal, and were apparently so situated that they might have heard the whistle, if it had been blown at any reasonable distance from the crossing. The engineer and fireman testified that the former gave the usual signal for the crossing at the whistling post, about fifteen hundred feet south of it, and two other witnesses testified that they heard the whistle, when the train was at the whistling post, as well as the danger signals at the railroad bridge. Upon this evidence, we think that the question of the negligence of the defendant was properly submitted to the jury. *Northern Pac. R. R. v. Freeman*, 147 U. S. 379; *D. & R. G. Ry. Co. v. Lorentzen*, 79 Fed. 21; Jones on Ev. (2 ed.) section 898; 1 Wigmore on Ev. section 664; *Menard v. Boston etc. R. R. Co.*, 150 Mass. 386; *Hahn v. Rio Grande Western Ry. Co.*, 22 Utah, 346; *Lee v. Chicago etc. Ry. Co.*, 80 Ia. 172.

Error was assigned upon an exception taken to instruction numbered one, given by the court to the jury, wherein the court defined the issues made by the pleadings, the objection being that the rate of speed at which the train was moving was mentioned as an element of the negligence alleged against the defendant. There appears to be no merit in this criticism, as the allegations of the complaint were properly construed by the court in that instruction. The jury were subsequently instructed, in instruction numbered 10A, that "the law does not impose any restriction upon the rate of speed at which a railway train may be run outside of incorporated towns; but the rate of speed of a railway train may be considered in determining whether

it was being negligently handled or controlled." The exception to the instruction was based upon the objection that the latter portion of it was misleading under the issues, and contradictory of the first clause of the same instruction.    It is not understood that counsel here contend that the instruction was wrong in substance, as an abstract proposition, but they say that there was nothing in the case, by way of allegation or proof, to authorize it, and it was therefore misleading.

What has been said with reference to instruction number one sufficiently disposes of the contention that the matter of the speed of the train was outside of the issues in the case.    Moreover, the rate of speed at which the train was moving, as indicated by the evidence, was material to be considered by the jury in connection with other facts and circumstances, among which may be mentioned the failure to give timely warning of the approach of the train, the fact that the crossing was known to be dangerous by reason of the obstructed view between the highway and the railroad, and the difficulty or impossibility of stopping the train on the down grade, if necessary to prevent injury to persons who might be in close proximity to the crossing, when the train came into view from behind the screen formed by the trees, and the further admitted fact that the engineer was running towards the "bad crossing," at more than the usual rate of speed on this particular part of the line.    We think that there was evidence to bring the case within the rule, which is adopted as a reasonable one, that "the question as to whether or not a rate of speed at a crossing is so dangerous

or excessive as to constitute negligence must depend upon the particular circumstances there existing, and if the circumstances are such that reasonable and impartial men may wholly differ as to whether the speed at a particular place showed want of reasonable care, the question as to whether the railroad company was guilty of negligence in maintaining such speed is one for the jury.'' *Bilton v. Southern Pacific Co.,* 148 Calif. 443, 447; *Denver etc. R. R. Co. v. Robinson,* 6 Colo. App. 432, 437; *Continental Imp. Co. v. Stead,* 95 U. S. 161; *Salter v. R. R. Co.,* 88 N. Y. 42; Elliott on Railroads, sections 1160-1161.

By instruction numbered 5A the jury were instructed, in substance, that if they should find from the evidence that plaintiff was, by reason of the negligence of defendant, suddenly placed in danger of bodily injury, and that she was dazed or seriously frightened by that fact, and that by reason of such fright her actions at that time were not those best calculated to insure her safety, such action would not constitute such contributory negligence as would excuse the negligence of the defendant or relieve it from liability on account thereof. It is objected on behalf of appellant that this instruction was erroneous, for the asserted reasons that there is no allegation in the complaint, and that the record contains no proof, that appellee was dazed or frightened. So far as concerns the matter of pleading, the last mentioned instruction plainly referred to the defense of contributory negligence, pleaded in the answer. As to the proof, it seems that the jury might well have found that the plaintiff was frightened, and perhaps ''dazed,'' by the sudden discov-

ery of the locomotive and train running at high speed toward the crossing just before her, the shrill blast of the danger signal in close proximity, the terrified scream of her young companion, when the latter abandoned control of the horse by dropping the lines and jumping from the vehicle, and the frightened actions of the horse—all of which appeared from testimony, the credibility and effect of which was for the jury's consideration. At all events, the testimony warranted the finding that she was called on to act, as she realized the situation, for her own protection, in the face of imminent danger, and in an emergency, not of her creating, under circumstances calculated to produce terror and bewilderment. It is not clear from the proof just what she did, or failed to do, after discovering the train, whereby her situation was made more dangerous. But the instruction was cautious, leaving all inferences respecting the negligence of the defendant, as well as its effect, if any existed, upon the plaintiff's mental state and conduct, to the jury. It was based upon a correct legal principle, and it is not perceived that there was prejudicial error in giving it, such as would justify the reversal of the judgment. See *Colorado Midland Ry. Co. v. Robbins,* 30 Colo. 449, 460; *Denver etc. Co. v. Dwyer,* 20 Id. 132, 139.

From an examination of the whole record it appears that the cause was fairly tried, and was submitted to the jury upon instructions by no means unfavorable to appellant. There is no error apparent in the proceedings of the district court, which would justify the reversal of the judgment, and it is affirmed.                    *Affirmed.*